*Decision will be entered under Rule 50.*

FALCON SEABOARD DRILLING COMPANY, BY THEO. N. LAW, C. W. ALCORN AND J. L. STAUSS, LIQUIDATING TRUSTEES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 41552. Filed August 18, 1958.

*Marshall Dean Davis, Esq.*, for the petitioner.
*James Q. Smith, Esq.*, for the respondent.

The respondent disallowed petitioner's claims for excess profits tax relief for the years 1944 and 1945 in the respective amounts of $11,036.32 and $110,829.83. The petitioner has abandoned its contentions as to all qualifying factors under section 722 (b) of the Internal Revenue Code of 1939, except that it is entitled to relief under section 722 (b) (4) because of the fact that it commenced business in September 1935, immediately prior to the base period, and consequently its average base period net income does not reflect the normal operation for the entire base period of the business and is therefore an inadequate standard of normal earnings.

FINDINGS OF FACT.

Some of the facts have been stipulated by the parties and the stipulation and exhibits attached thereto are hereby incorporated by this reference.

The petitioner was an Oklahoma corporation organized September 9, 1935, with its principal office and place of business located at Tulsa, Oklahoma. It was voluntarily dissolved on or about December 31, 1948, and was succeeded by a Delaware corporation of the same name with substantially the same stockholders. At the time of the petitioner's dissolution its officers, directors, and stockholders were Theodore N. Law, C. W. Alcorn, and J. L. Strauss, who thereupon became authorized under the laws of the State of Oklahoma to act on behalf of the petitioner corporation in the settlement of its affairs.

The petitioner's income and excess profits tax returns for the calendar years 1936 through 1946 were filed with the collector of internal revenue at Oklahoma City, Oklahoma. Claims for excess profits tax relief under section 722, I. R. C. 1939, for the taxable years 1944 and 1945 were filed by the petitioner with the Commissioner of Internal Revenue on December 29, 1949. Notice of the Commissioner's disallowance of the claims was sent to the petitioner under date of March 6, 1952.

The petitioner's organizers were Theodore N. Law, Franklin E. Bernsen, and Charles W. Alcorn. Law was a grandson of T. N. Barnsdale, organizer of Barnsdale Oil Company, a large oil-producing company. His mother was chairman of the board of directors of that company, and he himself had been connected with it. Bernsen was in the oil supply business and had other oil interests. Alcorn had been employed by the Shell Oil Company for a number of years, serving at the time of the petitioner's organization as assistant general superintendent of production for the central division, which included the territory in which the petitioner operated. Law was a man of wealth who had excellent business contacts. Bernsen was also a man of means who had considerable knowledge of the drilling business and was helpful in obtaining for petitioner the necessary equipment. Alcorn had a wide experience in the business and was an executive of remarkable ability. At its inception petitioner was adequately equipped, and had sufficient capital, a more than adequate executive staff, and excellent business connections.

From the date of organization the petitioner was engaged in the business of drilling oil and gas wells and was immediately successful. It began operations with two rotary drill rigs which it acquired in September 1935. It purchased three other rigs in 1936. No other rigs were purchased until after December 31, 1939.

In drilling an oil well with a rotary type drill, such as the petitioner operated, the drill bit is fastened rigidly to a section of drill pipe, usually about 4½ inches in diameter and 30 feet long, which is held in an upright position by the drilling derrick and rotated mechanically from the surface level, forcing the revolving bit into the earth. The rotation is at the rate of from 50 to 150 revolutions per minute, depending on the formation. The bit is 3 or 4 inches larger in diameter than the drill pipe, leaving a space of 2 inches or so between the pipe and the earth wall. As the drill rotates a soft mud is forced down under pressure inside the drill pipe and returns to the surface through the space between the pipe and the earth wall, bringing out the cuttings from the bottom of the hole. As the hole is deepened more sections of pipe are added. To change the drill bit, which in some formations has to be done often, the entire string of pipe must

be pulled from the hole. As it is taken out the pipe is disjointed in 2 or 3 sections (lengths), depending on the height of the derrick, and stacked inside the framework of the derrick. Then the new bit is fastened on the bottom section of the pipe and all of the pipe put back in the hole. In deep well drilling this may become a time-consuming and expensive operation. As the mud returns to the surface it flows onto a "shale shaker" which screens out the cuttings. These cuttings are examined from time to time for the geological information. They show when oil-bearing sands have been reached.

From the beginning of its operations and throughout its existence the petitioner drilled wells for others on a footage basis, well basis, and day-work basis. It completed 4 such wells in 1935, 17 in 1936, 47 in 1937, 25 in 1938, and 26 in 1939. These wells were located in New Mexico, South Texas, West Texas, Oklahoma, and South Louisiana. In 1936 the petitioner entered into agreements under which it drilled wells other than on a footage contract basis and acquired economic interests in the oil and gas in place. This drilling was on the so-called Priddle and Collins leaseholds.

The following table shows petitioner's oil and gas production income by leases (not including royalty income) for the period 1936–1945:

| Gross receipts | 1936 | 1937 | 1938 | 1939 | 1940 |
|---|---|---|---|---|---|
| Collins lease | $1,290.20 | $22,887.23 | $12,916.28 | $12,945.64 | $8,407.33 |
| Priddle | 7,636.37 | 24,473.54 | 25,941.37 | 22,127.74 | 21,605.66 |
| L. D. Williams | | | | 728.11 | 17,788.18 |
| Harmon | | | | | 6,240.46 |
| Oppenheimer | | | | | 1,212.31 |
| Beever  Sold 1943 | | | | | 246.45 |
| Melms | | | | | 870.98 |
| Total | 8,926.57 | 47,360.77 | 38,857.65 | 35,801.49 | 56,371.37 |

| | 1941 | 1942 | 1943 | 1944 | 1945 |
|---|---|---|---|---|---|
| Collins lease | $3,515.36 | $6,575.22 | $4,031.94 | $3,323.89 | $3,204.80 |
| Priddle | 21,039.44 | 20,667.14 | 16,683.80 | 12,720.33 | 11,229.44 |
| L. D. Williams | 15,165.33 | 19,237.74 | 19,047.44 | 18,905.60 | 16,877.59 |
| Harmon | 20,669.60 | 14,199.86 | 10,563.53 | 11,041.17 | 21,268.33 |
| Oppenheimer | 7,795.19 | 12,309.85 | 27,898.14 | | |
| Beever  Sold 1943 | 1,185.20 | 1,834.11 | 1,395.75 | | |
| Melms | 6,070.36 | 6,773.31 | 6,731.19 | | |
| Bean No. 1 | | | 21,152.83 | 3,296.15 | 545.02 |
| Bean "B" | | | 3,090.71 | 2,626.43 | 1,378.91 |
| Mead No. 1 | | | 2,570.93 | 1,221.65 | 651.07 |
| Spangenberg | | | 2,119.44 | 2,903.89 | 2,611.82 |
| Frevelle No. 1 | | | | 1,657.49 | 1,176.33 |
| Jackson No. 1 | | | | 4,904.76 | |
| Koelsch No. 1 | | | | 444.22 | 408.19 |
| Muslow No. 1 | | | | 2,239.44 | |
| Total | 75,440.48 | 81,597.23 | 115,285.70 | 65,885.02 | 59,436.30 |

The petitioner realized substantial profits from its contract drilling operations in 1936 and 1937 but sustained losses in 1938 and 1939, and in each of the succeeding years through 1943. The following is a summary of petitioner's profit and loss statements for the years

1936 to 1945, inclusive, divided as between contract drilling operations and oil and gas lease operations, and after allocation thereto of general overhead expenses:

| Contract drilling operations | | | |
|---|---|---|---|
| Year | Gross profits | Expenses including overhead | Net income |
| 1936 | $273,100.88 | $241,136.56 | $31,964.32 |
| 1937 | 740,473.37 | 658,876.12 | 81,597.25 |
| 1938 | 526,680.94 | 614,395.12 | (87,714.18) |
| 1939 | 599,597.48 | 616,062.12 | (16,464.64) |
| 1940 | 617,329.68 | 681,432.29 | (64,102.61) |
| 1941 | 731,603.38 | 771,006.20 | (39,402.82) |
| 1942 | 887,676.97 | 933,061.89 | (45,384.92) |
| 1943 | 871,692.71 | 874,755.71 | (3,063.00) |
| 1944 | 1,731,349.69 | 1,466,513.65 | 264,836.04 |
| 1945 | 1,905,894.13 | 1,685,226.77 | 220,667.36 |

| Lease operations (including royalty income) | | | |
|---|---|---|---|
| 1936 | $8,926.57 | $13,914.49 | ($4,987.92) |
| 1937 | 47,360.77 | 35,646.07 | 11,714.70 |
| 1938 | 38,857.65 | 29,476.92 | 9,380.73 |
| 1939 | 35,801.49 | 45,852.19 | (10,050.70) |
| 1940 | 56,516.45 | 36,676.18 | 19,840.27 |
| 1941 | 75,861.21 | 54,187.65 | 21,673.56 |
| 1942 | 81,951.03 | 51,258.79 | 30,692.24 |
| 1943 | 119,552.66 | 218,132.24 | (98,579.58) |
| 1944 | 68,010.54 | 226,422.02 | (158,411.48) |
| 1945 | 61,572.21 | 114,775.17 | (53,202.96) |

The petitioner's excess profits net income for the base period years and excess profits credit, as determined by the Commissioner,[1] are as follows:

| Excess profits net income for base period years | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| | $26,976.40 | $93,311.95 | ($78,333.45) | ($26,515.34) |

Net aggregate—all years _____ 15,439.56
Increase 1938 to ¾ of average of other 3 years under sec. 713 (e) __ 101,776.70

Total _____ 117,216.26
Average base period net income (¼ of $117,216.26) _____ 29,304.06
Excess profits credit (95% of $29,304.06) (Applicable to 1943, 1944, and 1945) _____ 27,838.86

There was a steady increase in the number of oil and gas wells drilled in the United States in each of the years 1934, 1935, 1936, and 1937, but the number fell off in 1938 and 1939. The price for a barrel of crude oil in petitioner's market area showed the following fluctua-

---

[1] Under the provisions of sec. 713 (e), I. R. C. 1939, petitioner was permitted to substitute 75 per cent of the average excess profits net income for its 3 best years for its poorest year, calendar year 1938. This resulted in an increase in the average base period net income of $25,444.17 for a total average base period net income of $29,304.06, and an increase in the aggregate for the base period from $15,439.56 to $117,216.26 or an increase of $101,776.70.

tions during the 1935–1939 period, and declines were reflected in 1938 and 1939 as shown below:

| Area | 1935 | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|---|
| South Louisiana | $1.00 | $1.06 | $1.22 | $1.16 | $1.06 |
| New Mexico | .78 | .84 | .94 | .93 | .82 |
| Oklahoma | 1.02 | 1.12 | 1.24 | 1.20 | 1.04 |
| West Texas | .76 | .84 | .95 | .90 | .81 |
| South Texas | 1.00 | 1.13 | 1.22 | 1.19 | 1.08 |

The petitioner's total investment in drill rigs, including drill pipes and joints, and in other depreciable assets at the end of each of the years 1935 to 1939, inclusive, was as follows:

| Year | Drill rigs | Total assets |
|---|---|---|
| 1935 | $86,459.65 | $87,969.05 |
| 1936 | 248,307.11 | 286,343.04 |
| 1937 | 395,192.23 | 450,990.72 |
| 1938 | 469,531.08 | 526,893.31 |
| 1939 | 529,773.06 | 593,847.63 |

Most of the petitioner's drilling contracts in the first year or so of its operations were with the Barnsdale Oil Company. The petitioner drilled one well for Atlantic Oil Company in 1936 and in 1937 secured drilling contracts with several other large oil producers, including Humble Oil Company, the Texas Company, and Shell Oil Company. Over the 5-year period (1935–1939), concerns with whom Law had a connection in one form or another accounted for 73.11 per cent of the total wells drilled, and other concerns accounted for 26.89 per cent of the total wells drilled.

There was considerable drilling work available in the localities in which the petitioner operated in 1936 and 1937. One of petitioner's two rigs in operation in 1935 and a portion of 1936 was located in New Mexico and one in south Texas. The petitioner acquired three additional rigs in 1936. The established fields in the areas where the petitioner had been drilling became largely drilled up by 1938, and the petitioner, being unable to secure sufficient drilling contracts in proven fields, began "wildcatting"; that is, drilling in unproved territory. Most of its drilling in 1938 and 1939 was of that type. Some was contract drilling and some for petitioner's own account. This involved frequent moves of the rig equipment, sometimes at long distances and at a considerable increase in the cost of operations. Keen competition developed among drillers in the proven fields.

Petitioner, in its Forms 991 and claims filed with the Commissioner of Internal Revenue, has asked for a constructive average base period

net income of $103,862 for the year 1944 and $104,867 for the year 1945.

Petitioner's average base period net income computed by the automatic application of section 713 (e), I. R. C. 1939, as amended, is not an inadequate standard of normal earnings because it commenced business immediately prior to the base period, and petitioner is not entitled to relief under the provisions of section 722 (b) (4).

OPINION.

KERN, *Judge:* The petitioner's case is premised upon a contention that under the provisions of section 722 (b) (4) of the Internal Revenue Code of 1939 "its average base period net income is an inadequate standard of normal earnings because the taxpayer, * * * immediately prior to the base period, commenced business * * * and the average base period net income does not reflect the normal operation for the entire base period of the business."

The plain meaning of the quoted provisions of the statute is that before the petitioner may obtain relief thereunder it must prove a causal relationship between its commencement of business immediately prior to the base period and the inadequacy of its average base period net income as a standard of normal earnings.

Counsel for both parties in praiseworthy compliance with our rules have filed herein an extensive stipulation of facts. In addition one witness, Alcorn, testified at length on behalf of the petitioner. His testimony was both frank and intelligent and gave to us a most interesting description of the oil-drilling business in general and of the operations of petitioner in particular.

After a careful consideration of the entire record herein, we have concluded that petitioner has failed to prove any causal connection between the inadequacy of its average base period net income as a standard of normal earnings (which we assume *arguendo*) and its commencement of business immediately prior to the base period. Indeed, the testimony and stipulated facts affirmatively indicate that its average base period net income was adversely affected, not by its commencement of business immediately prior to the base period, but by events and circumstances in no way related to the time when it commenced business which occurred during the last 2 years of the base period and which would have occurred and would have affected the petitioner adversely regardless of the time when petitioner commenced business.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*